United States District Court
District of Massachusetts

```
_____
                               )
UNITED STATES OF AMERICA,       )
                               )
          v.                    )
                               )        Criminal No.
ARTHUR GIANELLI, MARY ANN       )        05-10003-NMG
GIANELLI, FRANK IACOBONI, PHILIP )
PUOPOLO, DENNIS ALBERTELLI,      )
RANDY ALBERTELLI, GISELE         )
ALBERTELLI, SALVATORE RAMASCI,   )
STEPHEN RUSSO, RAFIA FEGHI, and  )
JOSEPH YERARDI,                  )
          Defendants.            )
_____ )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

In this criminal case, involving 11 defendants, ten (all except Stephen Russo) have filed a joint motion to suppress and two (Arthur Gianelli and Philip Puopolo) have filed individual motions to suppress.

I.   **Background**

On September 13, 2006, a Second Superseding Indictment was returned charging 13 defendants with 520 counts, all related to racketeering. Ten of those defendants have filed a joint motion to suppress the "fruits" of a wiretap. Two defendants have filed motions to suppress the "fruits" of searches conducted pursuant to warrants. Still pending but not addressed in this memorandum and order are three motions to sever and four motions to dismiss.

-1-

According to the government, the defendants were members of a criminal organization ("the Gianelli Group") which accrued revenue through illegal gambling activities, loansharking, extortion and money laundering and committed crimes of violence, including arson.  Arthur Gianelli ("Gianelli") was the purported leader of the Gianelli Group.  Joseph Yerardi, Jr. ("Yerardi"), who was in jail for racketeering for all but two months of the ten years between 1995 and 2005, maintained his contact with the Gianelli Group and, in fact, the government alleges that Gianelli ran Yerardi's gambling business and forwarded the proceeds to Yerardi and Yerardi's wife, who is also a defendant.

The government alleges that defendant Dennis Albertelli ("Albertelli") managed the sports betting business and helped with the electronic gaming machine business of Gianelli, acted as an agent for the sports betting and operated an illegal gambling business involving football cards.  Defendant Philip Puopolo ("Puopolo") is alleged to have engaged in illegal bookmaking and loansharking with other members of the Gianelli Group.  He also purportedly operated a sports betting office, acted as an agent for Gianelli, illegally operated electronic gaming machines at the Revere Businessmen's Association ("RBA") and attempted to persuade witnesses to provide false testimony.  Stephen Russo ("Russo") allegedly managed the sports betting office operated by Puopolo and participated in illegal bookmaking.  Salvatore

Ramasci ("Ramasci") allegedly acted as bookkeeper for the Gianelli Group's illegal sports betting business, coordinated the collection and payout of money to and from the gambling business and participated in the distribution of proceeds of the illegal gambling business.

The government also alleges that the Gianelli Group associated itself with certain members of organized crime including members of the New England Family of La Cosa Nostra ("the Family").  The leaders of the Gianelli Group purportedly made payments to certain members of the Family for the right to operate their criminal businesses.

The original indictment in this case was filed on January 5, 2005.  A superseding indictment was filed three months later and a second superseding indictment was filed September 13, 2006. Three of the original 17 defendants have pled guilty, one is a defunct corporation and two are fugitives.  The motion to suppress the fruits of the wiretap was filed March 21, 2008 and on that same day, Puopolo filed a motion to suppress the fruits of the search of his residence and the RBA.  Five days later, Gianelli filed a motion to suppress the fruits of a search warrant.  All three motions are opposed.

## II.  **Joint Motion to Suppress Fruits of Wiretap Warrant**

The Defendants argue that the wiretap warrants were not

valid and therefore any inculpatory evidence resulting from those warrants must be suppressed.

## A.   General Overview of Wiretap Law

The issuing of wiretap warrants is regulated under both state and federal law.  Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 <u>et seq.</u> ("Title III"), outlines the circumstances under which electronic surveillance may occur provided there is judicial approval.  The corresponding Massachusetts state laws with respect to wiretaps are codified at M.G.L. c. 272, § 99 ("Section 99").  Although certain of the Title III provisions incorporate state law, <u>see</u> 18 U.S.C. § 2516(2), federal law controls the admissibility of the fruits of state electronic surveillance in federal court.  <u>United States</u> v. <u>Sutherland</u>, 929 F.2d 765, 769-70 (1st Cir. 1991).

Intercepted communications or evidence derived therefrom may be admitted into evidence if the interception occurred in accordance with the provisions of Title III.  18 U.S.C. § 2517(3).  Certain kinds of errors in procuring a wiretap warrant do not result in suppression.  <u>United States</u> v. <u>Chavez</u>, 416 U.S. 562, 575 (1974).  Suppression is only required when there is a failure to satisfy a statutory requirement that "directly and substantially implement the congressional intention" to limit wiretaps.  <u>Id.</u>

B.      **Relevant Factual Background**

1.   **The Investigation**

The Special Service Section of the Massachusetts State Police Department led the investigation that resulted in the pending indictment.  Troopers Nunzio Orlando ("Orlando") and Pasquale Russolillo ("Russolillo") were the lead investigators.

On October 31, 2003, Essex County Assistant District Attorneys John Dawley, Brian O'Keefe and Alexander Cain ("the Essex ADAs") applied for and obtained a warrant ("the October 31 warrant") authorizing them to intercept wire communications over three cellular telephones, two belonging to Albertelli and one belonging to Ramasci.  Essex County District Attorney Jonathan W. Blodgett ("DA Blodgett") wrote a letter to the Essex ADAs and the judge specifically designating and empowering the ADAs to apply for the warrants.  In support of the application, Orlando submitted an affidavit in which he stated that there was probable cause to believe that Gianelli, Albertelli, Ramasci and others unknown are part of an organized group engaged in a conspiracy to commit violations of the Massachusetts gaming statute.  The Middlesex County District Attorney at the time, Martha Coakley ("DA Coakley"), also reviewed and authorized several Middlesex ADAs to apply for the wiretap warrant.

Relying upon communications intercepted during the execution of the first wiretap between November 13, 2003 and February 25,

2004, the Essex ADAs sought and obtained 10 renewal wiretap warrants for the Albertelli phones as well as additional cellular telephones.  One of the renewal warrant applications stated that the warrant was being obtained to investigate a violation of M.G.L. c. 271, § 17A, which prohibits the registering and placing of bets over the telephone.  Between November 18, 2004 and February 28, 2005, several ADAs in Middlesex County applied for and obtained 15 wiretap warrants seeking to intercept communications involving, among others, Puopolo and Russo.

### 2.   Allegations with Respect to the October 31, 2003 Warrant Application

Based upon information from two informants, "CI-1" and "CI-2", and police surveillance, in the October 31, 2003 application for a wiretap in Essex County, Orlando alleged that:

a)   in 1991, Gianelli was intercepted in a wiretap investigation which proved that he was a bookmaker and involved in an elaborate illegal video poker machine business;

b)   in 2003, Gianelli had poker machines used for illegal gaming purposes in a restaurant in Revere and inside the East Side Athletic Club in Malden;

c)   in July, 2001, CI-1 reported that Gianelli ran a high-stakes card game once a month at the RBA;

d)   Gianelli then ran a large gaming organization, still associated with Yerardi and utilized his former agents and bettors;

e)   Gianelli, Albertelli and Ramasci used their cellular telephones to conduct gaming activities;

f)   Puopolo and Russo were agents of Gianelli;

-6-

g)   Gianelli gave out to bettors a "1-800" telephone number to an off-shore gaming office where customers had to retrieve betting lines and submit their wagers;

h)   although Gianelli moved the location of his central gaming office offshore, bettors still met with Gianelli to resolve gaming-related issues and with Ramasci to pay gaming debts and to collect winnings; and

i)   payments, collections, resolution of debts and other gambling related transactions were all handled by Gianelli and his staff including Ramasci and Albertelli.

## C.   Analysis

In their motion to suppress the fruits of the wiretap warrant, the Defendants argue that 1) the October 31 Warrant was issued in violation of the necessity requirement under federal law, 2) many of the wiretap applications were deficient on their face, 3) the October 31 Warrant was issued without probable cause, 4) the December 31, 2003 Warrant was issued for an offense not designated in Section 99 and 5) Section 99 does not give courts the authority to issue a wiretap warrant for cellular phones.

### 1.   The Necessity Requirement

#### a.   Legal Standard

Wiretap warrants are not to be "routinely employed as the initial step in criminal investigation". United States v. Giordano, 416 U.S. 505, 515 (1974).  As such, the federal wiretap statute requires that the application for a wiretap warrant contain

-7-

> a full and complete statement as to whether or not
> other investigative procedures have been tried and
> failed or why they reasonably appear to be unlikely to
> succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(c).  Before a judge may approve a wiretap

order, he must be satisfied that the applicant has made such a

showing ("the necessity requirement").  18 U.S.C. § 2518(3)(c).

The application must demonstrate that the government made "a

reasonable, good faith effort to run the gamut of normal

investigative procedures" before applying for a wiretap, United

States v. Santana, 342 F.3d 60, 65 (1st Cir. 2003), and the

supporting affidavit must indicate a "reasonable likelihood that

alternative techniques would fail to expose the crime".  United

States v. Ashley, 876 F.2d 1069, 1073 (1st Cir. 1989).  In

reviewing a wiretap order of another judge, this Court does not

make a de novo determination of sufficiency.  Id. at 1074.

Instead, this Court examines the face of the affidavit and

decides whether the facts set forth in the application were

"minimally adequate to support the determination that was made".

United States v. Villarman-Oviedo, 325 F.3d 1, 9 (1st Cir. 2003).

### b.   Analysis

The Defendants argue that the first Essex wiretap failed to

meet the necessity requirement because 1) Orlando's description

of the investigative goals is misleading, 2) necessity cannot be

based on generalized allegations, 3) the particularized

allegations were boilerplate, 4) normal investigative techniques

had been successful and still were available.

     **i.    Description of the Investigative Goals**

     The Defendants argue that Orlando's description of the investigation goals were lofty and far-reaching.  Those goals included 1) identifying and bringing about the successful prosecution of persons at all levels of the organization and conspiracy, 2) tracing the proceeds of the bookmaking operation so as to seize and seek forfeiture of those proceeds, 3) infiltrating the Gianelli Group, 4) discovering and exploiting Gianelli's associations with members of the La Cosa Nostra and 5) dismantling his enterprise.  The Defendants claim that Orlando exaggerated the investigation goals in order to declare that measures short of wiretapping would not allow for completion of those goals.  They also contend that information in the affidavit made it clear that the wiretap would not provide information about others involved in the Gianelli group.

     As the government points out, the police may "cast a wide net" in its investigative goals.  United States v. Martinez, 452 F.3d 1, 6 (1st Cir. 2006) (upholding a wiretap where the investigative objectives were broadly defined).  The First Circuit Court of Appeals has upheld wiretaps where the goals of the investigation were to uncover the "full scope" of the crimes under investigation and the people involved and to obtain information about the "totality of offenses" in which the targets

were involved.  <u>Villarman-Oviedo</u>, 325 F.3d at 10.  The goals
identified by Orlando closely match those goals the First Circuit
has approved.

Orlando also made clear in his affidavit that, although
Gianelli was using an offshore bookmaking office, he continued to
employ staff and to interact and communicate with his agents and
bettors in Massachusetts.  Results from traditional investigative
techniques revealed that illegal gaming activities were occurring
in Massachusetts.  Consequently, the State Police had reason to
try to uncover the entirety of the conspiracy with respect to the
people and activities involved.  The police did not improperly
exaggerate the goals of the investigation and the motion to
suppress will not be allowed on that ground.

### ii.  Boilerplate and General Accusations

The Defendants next contend that Orlando improperly asserts
necessity through the use of boilerplate allegations.  They argue
that Orlando does nothing more than set forth generic and
standardized allegations of why normal measures are not
productive or feasible in a gambling investigation instead of
listing facts specific to the current case.  Some of the
generalizations, such as the ones relating to the use of pay
telephones, are irrelevant to this case.  The Defendants suggest
that explanations of necessity that discuss typical problems with
a certain kind of case instead of reference to specific facts

about the defendant are insufficient to establish necessity.

There is no requirement, however, that the government establish that the investigation at issue is different from an ordinary investigation for a crime of that kind.  United States v. Martinez, 452 F.3d 1, 5-6 (1st Cir. 2006).  The government must establish necessity with the particulars of a given investigation but "[t]he ordinariness of the investigation does not preclude a finding of necessity for the use of wiretaps to further the investigation."  Id.  Orlando demonstrated necessity by referencing common difficulties in gaming investigations because those difficulties also apply in this case (as discussed in more detail below).  Consequently, the motion to suppress will not be allowed on that ground.

### iii. The Particularized Allegations

The Defendants further assert that Orlando's affidavit contains few particularized explanations of why normal investigative techniques would not be sufficient in this case. The few particularized allegations that do exist are mirror (or near-mirror) images of allegations contained in affidavits filed by Orlando and Russolillo in other wiretap cases.  The Defendants include a chart in their brief comparing language from various affidavits submitted by the officers in other cases.  The charts reveal that the officers have used remarkably similar language in their prior affidavits.

As the government notes, the police need not draft entirely new language for every wiretap affidavit.  As explained above, wiretaps may be used in "ordinary" investigations.  Because investigations of gambling conspiracies may encounter the same difficulties when using normal investigative techniques, Orlando and Russolillo may have encountered the same reasons for necessity in more than one of their cases.  Because the circumstances they identified as creating necessity were applicable to this case (as explained in more detail below), the fact that Orlando or Russolillo may have encountered similar necessity in other cases is not cause for suppression.  See Martinez, 452 F.3d at 5-6 (finding that an investigation need not be unique in order to establish necessity for a wiretap).

### iv.  Success and Availability of Normal Investigative Techniques

The Defendants finally argue that normal investigative techniques were yielding results and therefore wiretapping was premature.  They contend that 1) Orlando's discounting of physical surveillance is unsubstantiated and that those techniques had been successful, 2) that the informants had significant dealings with Gianelli, Albertelli and Ramasci and that the informants provided significant information and 3) telephone analysis produced relevant information.  The Defendants suggest that such success with normal investigative techniques means that the government cannot show that "it has encountered

-12-

difficulties in penetrating a criminal enterprise or in gathering evidence". United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir. 1986). Moreover, the Defendants aver that the police failed to use several available normal investigative techniques including 1) using CI-1 and CI-2 to gather more information, 2) utilizing controlled calls, 3) cultivating additional informants, 4) obtaining telephone records and 5) conducting an investigation into the defendants' finances.

The affidavits that were submitted with the October 31 application demonstrated that the police had made a good faith effort to use the other techniques and that there was a reasonable likelihood that alternative techniques would fail. Although the State Police had gained some information from traditional techniques, Orlando made clear in the affidavit that there was still much to be done that had not and could not be done by conventional methods. See United States v. Cao, 471 F.3d 1, 3 (1st Cir. 2006)(holding that partial success using investigative techniques does not disprove necessity). The affidavit explains in detail (encompassing six pages) how and why other normal investigative techniques were either exhausted or not feasible.

The State Police had acquired evidence sufficient to establish probable cause, but it had not obtained, nor could it, proof beyond a reasonable doubt for the named subjects using

traditional investigative techniques.  There was also no reasonable prospect that traditional investigative methods would expose the full scope and membership of the conspiracy.  Such detail and reasoning is sufficient to meet the necessity requirement.  See Martinez, 452 F.3d at 5; see also United States v. Rivera-Rosario, 300 F.3d 1, 19 (1st Cir. 2002).

### 2. Alleged Deficiencies in the Wiretap Applications

The Defendants next argue that the Essex and Middlesex County applications suffered from a number of deficiencies.  They contend that 1) the warrant applications fail to demonstrate the requisite review and authorization by the District Attorney, 2) the December 23, 2003 Essex County application relies upon a non-existent designation letter, 3) the December 2, 2004 Monitoring Instruction Memorandum authorized interception of an unknown telephone number and 4) the Essex and Middlesex ADAs unilaterally expanded the court orders to authorize law enforcement officials to intercept and monitor all communications over targeted phones improperly.

### a. District Attorney Review and Authorization

### i. Legal Standard

Under Title III, only the principal prosecuting attorney of the state or the "principal prosecuting attorney of any political subdivision thereof", if the state wiretap statute authorizes him to make applications, may apply for a state order authorizing the

interception of wire communications.  18 U.S.C. § 2516(2).  The
Massachusetts wiretap statute authorizes specially designated
assistant district attorneys to submit wiretap applications.
M.G.L. c. 272, § 99(F)(1).  In Commonwealth v. Vitello, 367 Mass.
224 (1975), in order to ensure that Massachusetts law conformed
with federal law, the SJC interpreted the special designation
provision of Section 99

> to mean that an assistant district attorney may not
> apply at will for wiretap orders but must bring the
> matter for examination before his senior officer, the
> district attorney.

Id. at 256.  The district attorney must review and authorize each
application in writing.  Id.  Although failure to secure approval
from an authorized authority is grounds for suppression, United
States v. Giordano, 416 U.S. 505, 528 (1974), "[t]he absence of a
compelling signature on a critical document can be remedied by
proof of actual authority".  See United States v. Smith, 726 F.2d
852, 859 (1st Cir. 1984) (en banc).

### ii.  The Initial Applications

The Defendants argue that none of the relevant Essex County
documents, i.e., DA Blodgett's October 29, 2003 designation
letter, his October 29, 2003 letter to the warrant-issuing judge
and all of the applications, are sufficient to demonstrate
compliance with the requirement that the district attorney
carefully review the application before authorizing it and
submitting it to court.  They contend that the relevant documents

-15-

do not confirm that DA Blodgett personally reviewed the application.  Although he designated the Essex ADAs to make applications, Blodgett states that the applications will be reviewed by "me or my designee before being presented to you".  Blodgett also did not sign the applications, a practice that while not mandatory has been recommended by the SJC.  <u>Vitello</u>, 367 Mass. at 232.

Similarly, the Defendants assert that because former DA Coakley did not co-sign the first Middlesex County application, it was not appropriately authorized.  Because of those alleged deficiencies, the Defendants contend the applications were insufficient on their face or, in the very least, the Court should hold an evidentiary hearing to determine whether the applications were properly authorized, citing <u>United States</u> v. <u>Smith</u>, 726 F.2d 852, 860 (1st Cir. 1984)(remanding the issue of authorization to the District Court for an evidentiary hearing because it had not previously made a particularized inquiry into that issue).

The letters submitted by DAs Blodgett and Coakley are sufficient to satisfy the requirements of the statute and establish that the appropriate official authorized the original wiretap warrant application.  Coakley explicitly states in her letter to the warrant-issuing judge that she had personally reviewed and authorized the application.  With respect to the

Essex County applications, in a case with a very similar designation letter to DA Blodgett's letter, the SJC found proper authorization because, as in this case, the letter was dated near to the day of filing, the letter and application were bound together and the defendant offered no evidence that the application had not been properly authorized.  See Commonwealth v. D'Amour, 428 Mass. 725, 734-35 (1999).  DA Blodgett's letter did not include as detailed information about the crimes as the letter did in D'Amour but it specifically named the three individuals being investigated.  Although it is unfortunate that DA Blodgett has not adopted the SJC's suggestion of co-signing the application, as the First Circuit pointed out in Smith, such an oversight is not fatal to the wiretap.  726 F.2d at 859.

The Defendants rely heavily on Smith for their contention that the Court should hold an evidentiary hearing to determine whether DA Blodgett actually authorized the original warrant application.  In that case, however, in which the First Circuit remanded for an evidentiary hearing, the Court of Appeals specifically found that the district court "did not make a particularistic inquiry" into the issue of authorization.  Smith, 726 F.2d at 860.  There also was considerable confusion about what documents had been produced in the district court, which is not our case.  This Court has a copy of DA Blodgett's letter and affidavit and has made a particularized inquiry into whether the

-17-

warrant was authorized.  That inquiry leads to the conclusion
that the written authorizations were sufficient and that a
hearing is unnecessary.

### iii. Renewals and Amendments

The Defendants next contend that written designation letters
are required for amendment and renewal applications in order to
comport with federal law.  With respect to "amendments" (i.e.,
successive applications that seek to intercept communications
occurring over telephones or between individuals not identified
in an original designation letter), DA Coakley in Middlesex
County submitted a new designation letter with each application
requesting amendment, but the Essex County applications seeking
amendment did not include new designation letters, referring
instead to the October 30 designation letter.  Such an omission
is not fatal, however, because actual authorization by the
district attorney for amendment applications is not required.
See United States v. DeJesus, 752 F.2d 640, 643 (1st Cir.
1985)(affirming lower court decision holding that Section 99 does
not require actual authorization in amendment applications).

With respect to renewal applications, in both Essex and
Middlesex Counties they referred to earlier designation letters
rather than including new designation letters.  Under
Massachusetts law, no written authorization is required for
renewal applications.  See D'Amour, 428 Mass. at 735.  The

-18-

Defendants urge this Court to hold, however, that written authorization is required in order for Massachusetts law to comport with federal law.  Although the Defendants argue that in D'Amour the SJC relied on the assumption that a renewal is not an "application" in reaching the conclusion that renewal applications do not require written authorization, the Court concluded simply that "neither the wiretap statute nor Vitello requires written authorization for renewals".  Id.  As the First Circuit did in DeJesus with respect to amendment applications, this Court will, with respect to renewal applications,

> decline to attempt to provide [the Court's] own gloss
> covering this aspect of Massachusetts wiretap
> law...[and] not infer a requirement of district
> attorney authorization from this otherwise silent
> statute.

752 F.2d at 643.  Because authorization is not required for renewal or amendment applications, the Court will not suppress evidence for any alleged deficiency in such authorization.

### b.    The December 28, 2003 Designation Letter

The December 23, 2003 application in Essex County cites a designation letter dated December 28, 2003 to show that the application was authorized by the district attorney. No such letter exists.  The Defendants argue that failure to identify the designation authority for the December 23 application properly requires suppression of all evidence derived from that application and the resulting order.  As the government

points out, all of the earlier and later Essex County wiretap
applications referred to the October 29, 2003 authorization
letter and that it is therefore clear that reference to the
December 28, 2003 letter was simply a typographical error.  The
existence of an obvious typographical error is not a basis for
suppressing the fruits of the wiretap.  See United States v.
Chavez, 416 U.S. 562, 569 (1974)(holding suppression to be
inappropriate when the application was properly authorized but
the authorizing authority was misidentified).

> **c.   The Telephone Number in the December 2, 2004
> Application**

The Monitoring Instruction Memorandum dated December 2,
2004, a memorandum issued to law enforcement officers that
accompanied the warrant order, authorized law enforcement
officials to intercept and monitor communications occurring over
the telephone number (617) 331-1167.  That number was not the
subject of the accompanying application or court order provided
to the Defendants.  Consequently, the Defendants move the Court
to issue an order requiring the government to disclose whether
communications over that telephone number were intercepted and
whose communications were intercepted pursuant to the
instructions in the memorandum.

The telephone line at that number was apparently subscribed
to by Albert Sacramone who died in 2005 and was never a defendant
in this case.  None of the defendants in this case were

intercepted over the line.  The government has now supplied the Defendants with the separate order and application for the mystery phone number rendering this argument moot.

### d.  The Extent of the Monitoring

The Middlesex and Essex ADAs issued a Monitoring Instruction Memoranda to the monitoring teams of the relevant law enforcement agencies after they secured the wiretap warrants.  Those memoranda authorized the interception and monitoring of all conversations occurring over the identified telephone numbers even if none of the individuals identified in the order were a party to the intercepted conversations.  The Defendants contend that because the orders in this case limited interception to "communications of [the targets identified in the application] and their associates, agents and co-conspirators" rather than anyone using the telephone, the issuing court intended to limit interception to those conversations that included one of the targets.  The courts issuing the orders further instructed the applicants that if a person other than one of the targets engaged in a conversation related to the designated offenses and was identified, such conversation should be reported to the judge in a Status Report in order that the judge may determine whether a sufficient showing of probable cause had been made to amend the order to include other persons.

In United States v. Kahn, 415 U.S. 143 (1974), the Supreme

-21-

Court was confronted with a wiretap order that authorized the government to "intercept wire communications of Irving Kahn and others as yet unknown".  It held that, under the warrant, the government could intercept calls in which Irving Kahn was not a party.  Id. at 156-57.  Although the warrant in this case included instructions about reporting third party conversations to the Judge, an instruction apparently not included in the Kahn warrant, this Court finds the holding in Kahn controlling, especially in light of the fact that the warrant-issuing judge, after receiving the warrant monitoring instructions, continued to approve the renewals.  The evidence will not be suppressed based on this argument.

### 3.   The December 31, 2003 Warrant

The Defendants next argue that the December 31, 2003 warrant was issued for an offense not designated in Section 99.  On December 31, 2003, the Essex ADAs applied for and obtained a renewal warrant alleging that they had probable cause to believe that the targets of the investigation were violating M.G.L. c. 271, § 17A.  Section 99 does not authorize warrants for alleged violations of § 17A.  M.G.L. c. 272, § 99(B)(7).  Moreover, violations of § 17A are not punishable by imprisonment for more than a year and therefore no wiretap may be issued for such a violation under Title III.

The designation of § 17A appears to have been a

typographical error.  The December 31, 2003 application was captioned as a renewal application and all prior and subsequent applications referred to § 17, which is among the crimes for which Section 99 authorizes wiretaps.  Moreover, § 17A proscribes the use of a telephone for gambling purposes whereas § 17 proscribes the retention of a place for registering bets.  The application specifically states that there is probable cause with respect to the registering of bets.  The application also incorporates Orlando's affidavit which states at least four times that the crime under investigation was a violation of § 17, not § 17A.  Such a typographical error in the identification of the specific statute is not grounds to suppress the wiretap evidence.  <u>Chavez</u>, 416 U.S. at 569 (holding suppression to be inappropriate when the application was properly authorized but the authorizing authority was misidentified).

### 4.  Probable Cause for the First Essex County Wiretap

#### a.  Legal Standard

Title III requires the issuing judge to find that the applicant has established probable cause to believe that an individual has committed, is committing or is about to commit a designated offense.  18 U.S.C. § 2518(3)(a).  The judge must also find probable cause that communications concerning the crime will be obtained through such interception.  18 U.S.C. § 2518(3)(b).  Probable cause exists when there is a fair probability that a

crime is being committed.  <u>United States</u> v. <u>Moore</u>, 790 F.2d 13, 15 (1st Cir. 1986).  A prior judicial determination of probable cause is entitled to great deference by the reviewing court. <u>Illinois</u> v. <u>Gates</u>, 462 U.S. 213, 236 (1983).

### b.   Analysis

The Defendants argue that when Orlando first applied for the Essex County wiretap warrant he did not have probable cause to believe that the targets had violated M.G.L. c. 271, § 17 because 1) there was not sufficient evidence that the targets were registering bets or had apparatus in Massachusetts and 2) the evidence from the informants was uncorroborated and unreliable.

### i.   Location of the Violations

The Defendants argue that Orlando's affidavit failed to set forth facts adequate to support probable cause for a violation of M.G.L. c. 271, § 17 because it failed to establish "a place" in Massachusetts where bets were registered or where apparatus was kept.  The affidavit stated that Gianelli had moved all bet registering off-shore and therefore no such registration was occurring in Massachusetts.

The application of § 17 is not, however, "limited to bookmaking in the traditional sense" and is, instead, "broad and encompassing".  <u>United States</u> v. <u>Marder</u>, 48 F.3d 564, 567 (1st Cir. 1995).  Moreover, "[t]he possession of any recorded memorandum intended to be a minute of a bet is sufficient to

demonstrate a violation of...G.L. c. 271, § 17....” Commonwealth

v. Boyle, 346 Mass. 1, 4 (1963).  Although Orlando's affidavit

stated that bet registering had been moved offshore, it also

contained several allegations regarding the continuation of the

payment and collection of bets by Gianelli, Albertelli and

Ramasci in Massachusetts.  That information established at least

a fair probability that those three individuals had in their

possession records of the amounts and nature of bets.  Pursuant

to the holding in Boyle and in light of the broad interpretation

given to § 17, the fact that there was a fair probability that

the Defendants kept betting records in Massachusetts, provided

the applicants with probable cause to believe that the three co-

defendants were violating M.G.L. c. 271, § 17.  See Boyle, 346

Mass. at 4.

### ii.  Informant Reliability

The Defendants argue that the informants lacked reliability

and credibility because 1) the affidavit fails to disclose

whether the informants had criminal records or were receiving

rewards or incentives, 2) the State police did not corroborate

the informants' claims by verifying their phone numbers and 3)

Orlando did not confirm that the informants had actually

contacted any of the target phones.

Despite the omissions the Defendants identified, Orlando

provided a plethora of information from which the warrant-issuing

court was able to determine the informants' reliability.  Such information included that:

1) Orlando had known the informants for more than five years, knew their true names and their home addresses,

2) CI-1 and CI-2 were unaware of each other's proffered information but that information was consistent,

3) CI-1 and CI-2 had provided information to Orlando for the preceding two years,

4) State police investigations that had resulted from information obtained from CI-1 and CI-2 had confirmed their information to be truthful and reliable,

5) CI-1 allowed Orlando and Russolillo secretly to observe meetings between him and various bookmakers,

6) CI-2 provided critical information that led to wiretap investigations, subsequent seizure of gambling proceeds and conviction of various defendants for gambling offenses in three different cases and

7) CI-1 and CI-2 feared for their safety if their cooperation was exposed and the State Police thought it imperative to omit details that might tend to reveal their identities.

This information, combined with the fact that the state police corroborated some that the informants provided, was more than enough to establish the reliability and credibility of the informants.  See United States v. Greenburg, 410 F.3d 63, 67 (1st Cir. 2005).

### 5.   The Authority of the State Court with Respect to Cellular Telephones

The Defendants' final argument that the fruits of the wiretap should be suppressed is based upon their claim that the state court is not authorized to issue an order permitting the

interception of communications over cellular telephones.

The Defendants assert that the pre-1986 version of Title III, upon which Section 99 is based, did not authorize interception of cellular phones and point out that even the Massachusetts House of Representatives has noted that Section 99 is limited as evidenced by a 2007 bill which would update the definition of "wire communications" to replicate that of the amended Title III.

The Court finds the Defendants' arguments unpersuasive. The SJC has held that the Massachusetts courts construe the Massachusetts statute in accordance with the construction given the federal statute by the federal courts. O'Sullivan v. NYNEX Corp., 426 Mass. 261, 264 n.5 (1997). In fact, Massachusetts courts have previously interpreted the state wiretap statute to have incorporated an amendment to the federal wiretap statute. See Dillon v. MBTA, 49 Mass. App. Ct. 309, 314-16 (2000). The Massachusetts Superior Courts have repeatedly held that the Massachusetts wiretap statute empowers state courts in Massachusetts to authorize the interception of cellular phone conversations. See, e.g., Commonwealth v. Alleyne, 2007 WL 4997621, at *2 (Mass. Super. Nov. 1, 2007). This Court will follow their lead until a higher court holds otherwise.

Because this Court finds that the wiretap warrants were not unlawful in any way, the Defendants' motion to suppress the

fruits of the wiretap will be denied.

III. **Motions to Suppress**

Defendants Puopolo and Gianelli have also filed motions to suppress the fruits of searches of their residences and, in Puopolo's case, the RBA.

### A.  Relevant Factual Background

The facts relevant to their motions are as follows:

#### 1.  The Warrant for Gianelli's Home

On March 5, 2004, Massachusetts State Trooper Pasquale Russolillo ("Russolillo") sought and obtained search warrants for Gianelli's home (located at 420 Main Street, Lynnfield), automobile and person.  The warrants were executed that same day.

The warrant authorized State Police to seize a wide variety of items including books, papers, documents, receipts, bills and notations reflecting financial transactions, computers and related hardware, and other paraphernalia used to facilitate the unlawful registration of bets.  In support of his application, Russolillo submitted a 49-page affidavit relating to Gianelli and three of his co-defendants.

To establish probable cause for a warrant for Gianelli's residence, Russolillo cited several telephone calls which had been intercepted during the execution of a wiretap.  Those intercepted calls indicated that Gianelli was involved in an

unlawful gaming organization.  Russolillo also stated general
information and his opinions with respect to the practices of
persons involved in the operation of bookmaking and gaming
offices.  He explained, among other things, that 1) those
involved in gaming often hide their records and money on their
person, in their automobiles and in other secure areas, 2) hidden
areas of residences are thought to provide a degree of security
for records and money and 3) records reflecting a person's
financial transactions and condition are typically found in a
person's residence.

Russolillo also summarized the intercepted calls.  He noted
that conversations intercepted over Gianelli's cellular phone
revealed that Gianelli regularly instructed Albertelli and
Ramasci to come to his residence for paying or collecting monies
due or owed on bets registered with the Gianelli Group.
Russolillo further declared that 1) surveillance confirmed that
those two individuals went to Gianelli's home, 2) physical and
electronic surveillance revealed that on several occasions
Gianelli reviewed the gains and losses incurred by the gaming
organization at his home and 3) conversations between Gianelli
and Albertelli indicated that Albertelli delivered money derived
from gaming to Gianelli's wife at their home.

Russolillo made additional allegations based on specific
activities seen or calls intercepted.  In late November, 2003,

Gianelli and Ramasci made arrangements over the telephone for
Ramasci to deliver gaming material and money to the Gianelli
residence.  A police officer later observed Ramasci arrive by car
at the Gianelli home and lean into his trunk.  At the end of
January, 2004, an intercepted call recorded Gianelli and Ramasci
discussing gaming business that Ramasci had to attend to that day
and setting a time to meet at Gianelli's home thereafter.  In
March, 2004, in an intercepted call, Gianelli told Albertelli
that he was home and then stated that he would review "the
sheets" that night.  Other intercepted calls involving Gianelli
in March, 2004 provided evidence that he continued to be involved
in gaming activities.

### 2.   The Warrant for Puopolo's Home and the RBA

On March 3, 2005, Russolillo submitted an affidavit in
support of three applications for search warrants for five
different locations including Puopolo's residence (located at 350
Revere Beach Boulevard, Apartment P2-120, Revere) and the RBA.
The affidavit explicitly referenced and incorporated additional
affidavits written in support of an application and renewal
application for a wiretap.  The search warrants were issued by
the Massachusetts Superior Court the same day and executed five
days later.  Law enforcement officials seized no items from
Puopolo's person and seized very little from his residence but
they did seize assorted items from the RBA.

In the application for a warrant for Puopolo's residence, Russolillo opines, as he did in the affidavit in support of the application with respect to Gianelli's residence, that persons involved in bookmaking or gaming offenses often store records of the crimes in their homes, among other places.  With respect to case specific information, Russolillo stated that several completed calls were intercepted to or from the telephone in Puopolo's residence and the majority of those calls included gaming related matters.  Russolillo details five telephone calls intercepted between December 30, 2004 and February 21, 2005 in which Puopolo talks about gaming matters while in his home. Russolillo also states that Puopolo has used the RBA telephone number to discuss matters related to gaming and that intercepted conversations included Puopolo directing people to meet him at the RBA to pay or collect money.  The intercepted calls also revealed that Puopolo is responsible for paying customers who win bets on allegedly illegal poker machines within the RBA.

**B.  Analysis**

In their motions to suppress, Gianelli and Puopolo argue that the warrants were invalid because they lacked evidence of probable cause and particularity.

**1.  Probable Cause for the Warrants**

Gianelli and Puopolo first contend that there was no probable cause to search their homes because there was no

-31-

probable cause to believe that evidence of gaming would be found there.

### a.   Legal Standard

A warrant application must demonstrate probable cause to believe that 1) a crime has been committed (the commission element) and 2) particular evidence of the offense will be found at the place to be searched (the nexus element). <u>United States</u> v. <u>Ribeiro</u>, 397 F.3d 43, 48 (1st Cir. 2005).  In determining whether the nexus element is satisfied, the Court must make

> a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him,...there is a fair probability that contraband or evidence of a crime will be found in a particular place.

<u>Id.</u> at 48-49 (quoting <u>Illinois</u> v. <u>Gates</u>, 462 U.S. 213, 238 (1983)).  The court must consider

> whether the facts presented in the affidavit would "warrant a man of reasonable caution" to believe that evidence of crime will be found.

<u>United States</u> v. <u>Feliz</u>, 182 F.3d 82, 87 (1st Cir. 1999)(quoting <u>Texas</u> v. <u>Brown</u>, 460 U.S. 730, 742 (1983)).  Probable cause to believe one has committed a crime is not enough necessarily to search a suspect's residence.  <u>Feliz</u>, 192 F.3d at 88.  The nexus element can be inferred, however, from the kind of crime, the nature of the items sought, the extent of the opportunity for concealment and normal inferences as to where a criminal would hide evidence of a crime.  <u>Id.</u>  The nexus element also has a

temporal component in that there must be a fair probability that
evidence or contraband will be discovered at the place of the
search at about the time the search warrant would issue.  United
States v. Zayas-Diaz, 95 F.3d 105, 113 (1st Cir. 1996).  "In a
doubtful or marginal case, the court defers to the issuing
[judge's] determination of probable cause."  United States v.
Barnard, 299 F.3d 90, 93 (1st Cir. 2002).

### b.   Analysis of the Warrant Application for Gianelli's Residence

To support his argument that the warrant application did
not satisfy the nexus element, Gianelli contends that 1)
Russolillo's allegations regarding Gianelli's dealings with a co-
defendant in November, 2003 do not establish probable cause
because they occurred three months prior to the execution of the
warrant, 2) the intercepted calls from early 2004 do not create
probable cause because they did not connect Gianelli's home to
his gaming activities, 3) Russolillo's summaries of conversations
are not supported by specific information about conversations and
they have no temporal reference, 4) Russolillo refers to less
than a handful of calls relating to Gianelli's home and 5) each
of the intercepted conversations specifically cited by Russolillo
are over Gianelli's cellular telephone and therefore he could
have been talking from anywhere.

Gianelli may be correct that each allegation of Russolillo,
when taken individually, is insufficient to establish probable

-33-

cause, but when the evidence presented in the affidavit is
considered together, it satisfies the nexus element.  Law
enforcement had information that 1) Gianelli met with co-
defendants at his home on matters relating to gaming in November,
2003, 2) Gianelli continued to have telephone conversations and
engage in activities relating to his gaming organization up until
a few days before the execution of the search warrant and 3)
bookmakers often keep records and money in their residences.
Russolillo's opinion, gleaned from experience in gaming
investigations, that bookmakers keep records at their residences
was corroborated in this case by the conversations and activities
of Gianelli and his co-defendants.  When law enforcement
continued to observe activities and intercept calls suggesting
Gianelli's involvement in gaming activities, there was a fair
probability that evidence of Gianelli's gaming activities would
be found in his home.  Consequently, the evidence obtained as a
result of the search of Gianelli's residence will not be
suppressed for lack of probable cause.

> **c.    Analysis of The Warrant Application for
> Puopolo's Residence**

Puopolo argues in his motion to suppress, as did Gianelli,
that the warrant application did not satisfy the nexus element.
In support of that contention, he notes that the only evidence
connecting Puopolo's residence to alleged contraband are the
"general opinions" of Russolillo as well as five intercepted

telephone conversations none of which indicated any evidence of gaming in Puopolo's home.  He points to facts available to Russolillo suggesting the absence of probable cause, including:

1)    Puopolo was on notice of the ability and intent of law enforcement to search residences of targets because police had earlier searched the homes of other defendants,

2)    Russolillo had a pre-conceived opinion that bookmakers attempt to conceal from law enforcement those assets which are used to facilitate their gaming activities,

3)    the intercepted telephone conversations do not provide the requisite nexus to Puopolo's home and

4)    there were no assertions in the search warrant affidavit that law enforcement officials ever observed Puopolo conducting gaming or collection activities in his home.

Puopolo's arguments are unpersuasive.  The application affidavit, as well as the affidavits incorporated by reference, establish probable cause that evidence of a crime would be found in Puopolo's residence.  During intercepted calls, Puopolo discussed with at least two other co-defendants money won, lost, due and owed to him as well as the results in sporting events that would be beneficial for him and his gaming organization. Those conversations, conducted over Puopolo's home telephone while he was at his residence, indicate by a fair probability that he had information with respect to betting in his home. Moreover, although probable cause cannot rest entirely on a law officer's opinions based on his experience and training, Russolillo's statement that bookmakers generally keep records in

their home further supports a finding of probable cause in this case.

Despite Puopolo's argument to the contrary, his knowledge that residences of others had been searched and that bookmakers generally like to conceal evidence of gaming does not eliminate probable cause that evidence would be found in his residence, especially in this case where, after the earlier searches occurred, law enforcement officers continued to observe and hear Puopolo engaging in conversations relating to gaming activities. Moreover, the fact that law enforcement officials did not observe evidence of gaming activity at Puopolo's home prior to the search does not disprove the existence of probable cause. Puopolo's storage of records and/or cash in the house would be easy to conceal from law enforcement engaged in surveillance.

### 2.  The Particularity of the Warrant

Puopolo next contends (and Gianelli adopts his argument) that the warrants violated the Fourth Amendment particularity requirement.

### a.  Legal Standard

In order for a warrant to be reasonable and thereby conform with the dictates of the Fourth Amendment, it must state with particularity the items to be seized and the place to be searched. United States v. Vega-Figueroa, 234 F.3d 744, 756 (1st Cir. 2000). The purpose of the particularity requirement is to

prevent wide-ranging general searches by the police.  Id.  If a
warrant fails to conform to the particularity requirement of the
Fourth Amendment, it is generally unconstitutional.  Groh v.
Ramirez, 540 U.S. 551, 557 (2004).

### b.  Analysis

Puopolo argues that the warrants authorizing a search of his
residence and the RBA "authorize[]...wide-ranging and
indiscriminate rummaging for anything and everything".  He argues
that they lack particularity because they 1) fail to specify the
criminal offenses under investigation, 2) call for the seizure of
any and all financial records without temporal or subject
limitation and 3) permit the seizure of computers and related
hardware despite the lack of probable cause that Puopolo used any
computers.

With respect to Puopolo's first concern, the search warrants
incorporated by reference the underlying search warrant affidavit
which stated the offense under investigation.  See Groh, 540 U.S.
at 557-58 (holding that a warrant may cross-reference other
documents).  Moreover, the search warrants repeatedly described
the substance of the offense by stating, for example, that the
items to be seized should be those items "evidencing the unlawful
placement, receipt and registration of bets on the outcome of
sports events".

With respect to Puopolo's second concern, as the government

points out, the fungible nature of money makes the seizure of a
wide-range of financial records appropriate.  Money made in
illegal activities can easily be commingled with money made from
legal activities and, therefore, tracing ill-gotten money
requires access to all kinds of financial information and
documentation.

Finally, with respect to Puopolo's third concern, the
seizure of computers was limited to those computers used to
facilitate the unlawful registration of bets.  That limitation
narrowed the items subject to seizure, eliminating any Fourth
Amendment difficulties with respect to the seizure of computers.
Because the warrants satisfied the particularity requirement of
the Fourth Amendment, defendants' motions to suppress the fruits
of the search of the residences of Gianelli and Puopolo, as well
as the search of the RBA, will be denied.

### 3.   The Good Faith Exception

Even if the warrants were invalid, suppression is not
appropriate where, as here, the officers' good faith reliance on
the warrants was reasonable.  <u>United States</u> v. <u>Leon</u>, 468 U.S.
897, 922 (1984).  Supposing that the warrants did not adequately
state probable cause, the fruits of the search would still be
admissible because the warrants were not "so lacking in indicia
of probable cause as to render official belief in its existence
entirely unreasonable."  <u>See</u> <u>id.</u> at 923. Nor did any possible

-38-

lack of particularity render the warrant "so facially deficient...that the executing officers cannot reasonably presume it to be valid." <u>See</u> <u>id.</u> Consequently, the good faith exception provides another basis on which to deny the motions of Puopolo and Gianelli to suppress.

### ORDER

In accordance with the foregoing, Defendants' Motion to Suppress the Fruits of a Wiretap (Docket No. 458), Puopolo's Motion to Suppress Fruits (Docket No. 462) and Gianelli's Motion to Supress Fruits (Docket No. 470) are **DENIED**.


**So ordered.**

                  <u>/s/ Nathaniel M. Gorton</u>
                  Nathaniel M. Gorton
                  United States District Judge

Dated October 8, 2008